**UNITED STATES v. ATLANTIC REFINING CO.**

District Court, S. D. New York.   May 8, 1929.

this case, the clause appears from the context to have reference to the port, not merely to a place of loading within the port, and by virtue of the subsequent designation Smith's Bluff and Port Arthur are to count as one port for the purpose of loading. Upon the evidence it must also be found that, when the vessel arrived off Sabine Bar, she was unable to proceed further toward her destination until permission was secured to proceed to Port Arthur on October 2d, there to take bunkers. Thereafter she was prevented by the wreck of the Isonzo from proceeding further to Smith's Bluff until the first opportunity offered on October 8th.

The question presented is: How far may the clause, "as near thereunto as she may safely get," extend the right of the vessel to give notice of arrival, and thus to start the running of lay days? The interpretation of this clause by Lord Campbell in Schilizzi v. Derry (1855) 24 L. J. Q. B. 193, 4 E. & B. 873, which was appoved in Metcalfe v. Brittania Iron Works (1876) 1 Q. B. D. 613, was that the meaning must be that the vessel should get within the ambit of the port, though she may not reach the harbor. In Dahl v. Nelson (1881) 6 App. Cas. 38, a decision of the House of Lords, it was doubted whether the language which Lord Campbell used was quite the most accurate to express his idea, and in the latter case decision went on the ground that the vessel, being prevented from entering the docks where the cargo was to be discharged, had come as near thereto as she could safely get, and, being at a place off the docks where it was both reasonable and customary to unload ships, she had completed her voyage. In reaching this conclusion it was taken as established by the English decisions that, if the voyage is interrupted by an impediment placed in the way of the ship at a distance from the primary place of discharge, she cannot be held to have got "as near thereto as she could safely get." This decision of the House of Lords was cited with approval in The Gazelle and Cargo, 128 U. S. 474, 9 S. Ct. 139, 32 L. Ed. 496.

In the absence of express agreement to that effect, a vessel cannot be held to have arrived at a loading or at a discharging port, "or as near thereunto as she can safely get," when lying in an open roadstead where cargo is not customarily laden or discharged, and where it is obviously unsafe to attempt such an operation, for this would be to imply agreement inconsistent with the mutual obligations of the parties. It would be most unreasonable to imply agreement that the

Charles H. Tuttle, U. S. Atty., of New York City (Harold F. Birnbaum, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

John H. Stone and Howard M. Long, both of Philadelphia, Pa., Burlingham, Veeder, Fearey, Clark & Hupper, of New York City, Eugene Underwood, Jr., and Roscoe H. Hupper, both of New York City, of counsel), for respondent.

THACHER, District Judge (after stating facts as above). The designation of Smith's Bluff as the loading point fixed the primary obligation of the vessel to proceed there before announcing arrival and readiness to load. Until she "arrived," no obligation could arise to furnish cargo. But here, as in so many cases, the obligation to proceed to the place of loading is qualified by the phrase, "or as near thereunto as she may safely get (always afloat) and there load * * * a full and complete cargo." In

charterer should be responsible for delay in loading the vessel before she had come to a place where the freight could be safely put on board. Readiness to load implies ability to safely receive the cargo, if other words do not destroy the implication. If in the preparation of commercial contracts the parties leave to implication the limitations which they must have intended should control the generality of such language as the clause here under consideration, the courts must assume that they intended to agree upon what was fair and practical in a commercial sense, with a view to the accomplishment of the business on foot. Reading the contract thus, I find nothing to warrant notice of readiness to load when the vessel lay anchored off Sabine Bar, 3½ miles from shore, in an open roadstead without shelter from the sea.

The American decisions which bear analogy in point of fact to the case at bar have been decided upon charter provisions fixing the place of arrival or the commencement of lay days, and apparent confusion has resulted from judicial efforts to deduce intention from varying charter provisions not expressly directed to the point under discussion. See Judge Rose's dissenting opinion in The Lake Yelverton, 300 F. 47 (C. C. A. 4), with which compare his opinion in F. S. Royster Guano Co. v. United States, 18 F. (2d) 469 (C. C. A. 4).

Brief reference will be made to the cases which may perhaps be regarded as nearest to the point. In Mencke v. Cargo of Java Sugar, 197 U. S. 248, 23 S. Ct. 86, 47 L. Ed. 163, the berth designated for discharge was the Arbuckle Sugar Refinery, located on the Brooklyn shore of the East River, above the Brooklyn Bridge. Because the height of her masts was such that the vessel could not pass under the bridge, the cargo was discharged on a dock below the bridge, presumably a safe and proper place of discharge. It was held that, having proceeded as near to the discharging point as she could safely get, the vessel was not required to carry the cargo farther.

In Yone Suzuki v. Central Argentine Ry., 27 F.(2d) 795, 802 (C. C. A. 2), the charter described a voyage "to Buenos Aires, or as near thereunto as she may safely get and always lie afloat and there deliver a full and complete cargo." But another clause pre-scribed lay days for discharging as "commencing from twenty-four hours after arrival at or off discharging port, whether steamer is in berth or not." It was held: "That such explicit language as 'at or off' the 'discharging port' made Buenos Aires Roads the place where the lay days began to run."

In Thomas Bell & Co. Ltd. v. Stewart, 31 F.(2d) 44 (C. C. A. 5), the charter was for a voyage from New Brunswick to Miami, Fla. Notice of readiness was served by the master when the ship passed the customs and lay at Miami Roads, 6 miles from Miami harbor. Before lay days expired, the channel leading to the harbor was blocked by the sinking of another vessel, so that it was impossible for the ship to enter. The charter provided that lay days for loading and discharging should commence "from the time the Captain reports his vessel ready to receive or discharge cargo, having fulfilled Custom House formalities, whether berth or cargo available or not." Having passed the customs, the agreement of the parties controlled the commencement of lay days upon the giving of notice, and it was accordingly held that the consignee was liable for demurrage. Cureton Lumber Co. v. Hammond Lumber Co., 29 F.(2d) 973 (C. C. A. 5), which arose from the same accident, went off on the ground that the blocking of the channel was a hindrance beyond the control of either party, mutually excepted by the terms of the charter.

It may be that delay in reaching the loading point was so extended as to be entirely unreasonable, and therefore so far in conflict with the presumed intentions of both parties as to have justified the contention that it could no longer be binding on either. But that question does not arise, because the vessel insisted upon performance, as did the charterer, and performance was had by both. For the delay in performance, the loss must fall upon the ship, because she had not "arrived" when the notice of readiness to load was first given. No notice of arrival at Port Arthur, where the vessel could have been safely loaded, having been given, the lay days did not commence until she arrived at Smith's Bluff. Counting lay days from that time, no demurrage is due under the terms of the charter, and accordingly the libel must be dismissed.